T.C. Memo. 1997-88


UNITED STATES TAX COURT


ESTATE OF WILLIAM H. KAISER, DECEASED, WILLIAM R. KAISER AND
ROBERT B. KAISER, CO-EXECUTORS, SUCCESSOR IN INTEREST TO KAISER
FAMILY CORPORATION AND MARGARET G. KAISER QUALIFIED TERMINABLE
INTEREST TRUST, WILLIAM R. KAISER AND ROBERT B. KAISER, CO-
TRUSTEES, SUCCESSOR IN INTEREST TO ESTATE OF WILLIAM H. KAISER,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

ESTATE OF WILLIAM H. KAISER, DECEASED, MARGARET G. KAISER,
WILLIAM R. KAISER AND ROBERT B. KAISER, CO-EXECUTORS AND MARGARET
G. KAISER QUALIFIED TERMINABLE INTEREST TRUST, MARGARET G.
KAISER, WILLIAM R. KAISER AND ROBERT B. KAISER, CO-TRUSTEES,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT


Docket Nos. 3899-95, 3953-95.      Filed February 20, 1997.


John Kevin Mahoney, for petitioners.

Raymond M. Boulanger, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, Judge:  By notices dated December 22, 1994, respondent determined deficiencies in petitioners' Federal income taxes as follows:

Kaiser Family Corporation (formerly Kaiser Agency, Inc.), docket No. 3899-95

| Year | Deficiency |
|------|------------|
| 1990 | $28,336 |
| 1991 | 29,237 |
| 1992 | 85,161 |

William H. (Deceased) and Margaret G. Kaiser, docket No. 3953-95

| Year | Deficiency |
|------|------------|
| 1990 | -- |
| 1991 | -- |
| 1992 | $127,954 |

Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  After concessions, the sole issue for decision is whether Kaiser Agency, Inc.'s subchapter S election terminated as a result of excess passive investment income.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  At the time the petitions were filed, petitioners had mailing addresses in Rochester, New York.

Kaiser Agency, Inc. (Kaiser), was an independent insurance agency and was incorporated under New York law in 1958. William H. Kaiser was Kaiser's sole shareholder until he died on November 8, 1992. From that date until the corporation was dissolved on or about September 30, 1993, Mr. Kaiser's estate was Kaiser's sole shareholder.

Kaiser marketed insurance policies underwritten by several large insurance underwriters and performed three primary services. First, it issued new policies to insurance purchasers. In issuing new policies, a Kaiser representative would meet with the prospective insured to discuss his or her insurance needs. Based on those needs and the prices offered on suitable policies, Kaiser would recommend a policy. Upon issuing the policy, Kaiser would collect the initial premium from the insured and issue the policy from its office. Policies were printed on forms provided by the underwriters and were subject to the underwriters' specifications. The issuance of a policy by Kaiser generally bound the underwriter to the terms of the policy.

Second, Kaiser made changes to existing policies when required. For example, if an insured sold his car and bought another, the agent would review the policy on the car and make the necessary changes.

Third, Kaiser renewed policies for insureds. The policies Kaiser marketed generally expired and had to be renewed periodically. Between 45 and 60 days prior to a policy's renewal

date, the relevant underwriter would transmit the renewal policy to Kaiser. At that time, Kaiser would review the policy to determine if it was the best policy for the particular insured. If Kaiser determined that a change in coverage was warranted, it would contact the insured and recommend the change. The insured could either accept the recommended policy change or renew the existing policy.

Kaiser had a separate contract with each underwriter it represented. Each contract delineated the terms of the agency relationship. The contracts provided that Kaiser would earn a commission on each policy it issued. The commission generally was a percentage of the premium due under the policy, and the percentage varied depending on the type of insurance issued. The agency contracts also provided that the "expirations" (i.e., renewal lists and all other information regarding insureds) held by Kaiser generally remained Kaiser's property even after termination of the agency relationship and that the underwriters were not permitted to solicit business directly from, or discuss policies with, prospective or existing insureds.

The insureds paid premiums either to Kaiser (i.e., indirect premium payments) or directly to the underwriter (i.e., direct premium payments). In the case of indirect premium payments, Kaiser generally received a check from the insured payable to Kaiser. Kaiser would deposit the check, retain its commission,

and hold the balance for the underwriters in a separate "premium account".  Kaiser's contracts with each underwriter required Kaiser to hold such funds in a fiduciary capacity and prohibited Kaiser from commingling them with Kaiser's own funds.  Kaiser would later send these funds to the underwriter.  In the case of direct premium payments, the underwriter would send Kaiser its commission and retain the balance.

Kaiser elected subchapter S status on July 1, 1987, and filed Forms 1120S (U.S. Income Tax Return for an S Corporation) in 1990, 1991, and 1992.  Kaiser reported its income on the accrual method of accounting.  In calculating its gross income, Kaiser included in its gross receipts the premiums paid on all policies issued by it during the year and deducted as a cost of goods sold the portion of the premiums forwarded to the underwriters (in the case of indirect premium payments), or retained by the underwriters (in the case of direct premium payments).

Respondent issued a notice of deficiency, dated December 22, 1994, to Kaiser Family Corporation (the successor in interest to Kaiser) for years 1990, 1991, and 1992.  In the notice, respondent determined that Kaiser was not an S corporation during the years in issue.  As a result, respondent determined that Kaiser owed corporate income taxes as a subchapter C corporation. Respondent issued a second notice of deficiency, also dated December 22, 1994, to William and Margaret Kaiser relating to

their 1990, 1991, and 1992 joint Federal income tax returns. Respondent determined that certain deductions and items of income reported on the individual returns should have been reported on Kaiser's corporate income tax returns.  The petitions in these cases were filed on March 13, 1995.

OPINION

Generally, a small business corporation may elect to be treated as an S corporation.  Secs. 1361(a)(1), 1362(a)(1). Section 1362(d) provides that an election to be treated as an S corporation terminates if the corporation has:  (1) Subchapter C earnings and profits at the close of each of 3 consecutive taxable years; and (2) gross receipts for each of such taxable years more than 25 percent of which are passive investment income.  Secs. 1362(d)(3), 1375.

The parties have stipulated that Kaiser had subchapter C earnings and profits at the close of each of 3 relevant consecutive years.  The only issue is whether Kaiser had passive investment income in excess of 25 percent of its gross receipts. Petitioners contend that Kaiser should be allowed to include all premiums (i.e., Kaiser's commission plus amounts forwarded to, or retained by, the underwriters) paid on policies it issued and as a result Kaiser's passive investment income did not exceed 25 percent of its gross receipts.  Respondent contends that Kaiser should be permitted to include only its commissions on such

policies, and as a result Kaiser's passive investment income exceeded 25 percent of its gross receipts. Petitioners bear the burden of proof. Rule 142(a).

The Code does not define gross receipts for purposes of sections 1362(d)(3) and 1375. The temporary regulations under section 1362 in effect for the years in issue also did not define the term. See generally sec. 18.1362-1 and -2, Temporary Income Tax Regs., 48 Fed. Reg. 3591 (Jan. 26, 1983), and later amendments.

Petitioners contend that because Kaiser determined which underwriter would ultimately receive the premiums, and because Kaiser owned the expirations associated with the policies it issued, Kaiser should be permitted to accrue in its gross receipts the premiums paid on all policies it issued. Petitioners emphasize that Kaiser was an accrual method taxpayer and that, in petitioners' view, all events necessary to trigger accrual had occurred.

Petitioners do not advance, nor do we find, any plausible theory that would allow Kaiser to include direct premium payments in its gross receipts. Even assuming that accrual rules were applicable to Kaiser in determining gross receipts, those rules do not support petitioners' position. An accrual method taxpayer includes income in the year in which the amount can be determined with reasonable accuracy and all events have occurred which establish the right to receive the item of income. See sec.

1.451-1(a), Income Tax Regs. The direct premium payments, however, were made directly to the underwriters, and Kaiser had no present or future claim to the funds. Thus, there was no set of events that would ever establish Kaiser's right to receive the payments. As a result, the amounts were not includable in Kaiser's gross receipts.

We do not reach the issue of whether the indirect premium payments were includable in Kaiser's gross receipts, because petitioners have not established the respective amounts of direct and indirect premium payments. As a result, even if Kaiser were permitted to include indirect premium payments in its gross receipts, petitioners have not established the amount, if any, of such payments. We note, however, that approximately 90 percent of the premiums were directly billed by the insurance underwriters.

The parties have brought to our attention Rev. Rul. 69-192, 1969-1 C.B. 206. That ruling allowed an insurance agent similar to Kaiser to include in its gross receipts the indirect premium payments on policies it issued. In the present case, petitioners have not established the amount, if any, of indirect premium payments. Consequently, the revenue ruling does not support petitioners' contentions.

Accordingly, we conclude that Kaiser's S corporation election terminated by reason of excess passive investment income, and we sustain respondent's determination.

We have considered all other arguments made by the parties and found them to be either irrelevant or without merit.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.